113 F.3d 1259
 155 L.R.R.M. (BNA) 2257, 145 A.L.R. Fed. 769,
324 U.S.App.D.C. 317, 65 USLW 2769,
133 Lab.Cas. P 10,006, 134 Lab.Cas. P 10,006
 DIAMOND WALNUT GROWERS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Cannery Workers, Processors, Warehousemen and Helpers, Local
601 and International Brotherhood of Teamsters,
AFL-CIO, Intervenors.
 No. 95-1075.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Jan. 29, 1997.
Decided May 20, 1997.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Robert G. Hulteng, argued the cause for petitioner, with whom Robert Leinwand, San Francisco, CA, was on the briefs.
 Peter D. Winkler, Supervisory Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, and Vincent J. Falvo, Jr., Attorney, Utica, NY, were on the brief. Linda Dreeben, Supervisory Attorney, Washington, DC, and Julie B. Broido, Senior Attorney, Pittsburgh, PA, entered appearances.
 Kenneth C. Absalom, San Francisco, CA argued the cause for intervenors, with whom Jonathan Hiatt, Marsha S. Berzon, San Francisco, CA, and Judith A. Scott, Boston, MA, were on the brief. Kirsten S. Spalding, San Francisco, CA, entered an appearance.
 Before EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, and GARLAND,* Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 Opinion concurring in part and dissenting in part filed by Circuit Judge WALD, with whom Chief Judge EDWARDS and Circuit Judge ROGERS and Circuit Judge TATEL join.
 Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON, with whom Circuit Judge SENTELLE and Circuit Judge RANDOLPH join.
 SILBERMAN, Circuit Judge:
 
 
 1
 Diamond Walnut Growers, Inc. petitions for review of a National Labor Relations Board order holding that it committed an unfair labor practice in its placement of three returning strikers. We grant the petition for review in part and in part grant the NLRB's cross-application for enforcement.
 
 I.
 
 2
 Diamond Walnut processes and packages walnuts for national and international distribution. The company operates with a year-round workforce, supplemented by additional seasonal hires during the fall harvesting season. Diamond's employees have for years been represented by Cannery Workers, Processors, Warehousemen and Helpers Local 601 of the International Brotherhood of Teamsters, AFL-CIO (the union). In September of 1991, following expiration of the most recent collective bargaining agreement between Diamond and the union, nearly 500 of Diamond's permanent and seasonal employees went on strike. Diamond hired replacement workers to allow it to continue operations.
 
 
 3
 By all accounts, the strike was, and remains, a bitter affair. The strikers are alleged to have engaged in various acts of violence against the replacement workers, especially at the outset of the strike, and restraining orders issued against both strikers and replacements. See generally Diamond Walnut Growers, Inc., 312 N.L.R.B. 61, 1993 WL 356124 (1993). In addition, as part of its effort to exert economic pressure on Diamond, the union undertook an international boycott of its product. The boycott included a well-publicized national bus tour during which union members distributed to the public leaflets which described Diamond's workforce as composed of "scabs" who packaged walnuts contaminated with "mold, dirt, oil, worms and debris."
 
 
 4
 Approximately one year into the strike, the Board held a representation election. The union lost the election, but its objections prompted the Board to order a rerun to be held in October of 1993. Just over two weeks prior to the new election, a group of four striking employees, represented by a union official, approached Diamond with an unconditional offer to return to work. According to the letter presented to the company at that time by their representative, the employees were convinced that "a fair election [was] simply impossible." Nonetheless, the employees "fe[lt] that it [was] important that the replacement workers ... have an opportunity to hear from Union sympathizers." Thus, the group of strikers was "available and willing to return to immediate active employment." The following day, the union notified Diamond that pursuant to the above-quoted letter, two additional strikers were willing to return to work.
 
 
 5
 It is undisputed that for three of the returning strikers, neither the permanent jobs they held before the strike, nor substantially equivalent ones, were available at the time of their return. Diamond placed these three in various seasonal jobs, and it is these placements which led to the order under review. Prior to the strike, Willa Miller was a quality control supervisor; she was placed in a seasonal packing position even though a seasonal inspection job was available. Alfonsina Munoz had been employed as a lift truck operator and, despite the availability of a seasonal forklift job, was given a seasonal job cracking and inspecting nuts in the growers' inspection department at the front end of the production process. Mohammed Kussair, formerly an air separator machine operator, was, like Munoz, placed in a seasonal cracking and inspecting position in the growers' inspection department. Neither Miller nor Munoz complained to Diamond about their job placements. Kussair asked to be transferred to a loader position for which he was qualified after receiving three oral reprimands for failing to meet his daily quota, the third of which led to a written reprimand. Diamond sought to accommodate Kussair's transfer request, but he left to rejoin the strike before it could do so.
 
 
 6
 The rerun election took place as scheduled, and the union lost. Following that election, the General Counsel filed a complaint alleging that Diamond had violated sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(3), (a)(1) (1994),[1] by unlawfully discriminating against Miller, Munoz, and Kussair. The General Counsel alleged that because of their protected activity, Diamond declined to put them in certain available seasonal positions for which they were qualified and that were preferable to the positions in which they were actually placed. After a hearing, an administrative law judge recommended that the charges be dismissed. He found that Diamond had "discriminated" insofar as it had placed the employees at least in part because of their protected activity, but he did not think that discrimination "unlawful" under the Board's decision in Rose Printing Co., 304 N.L.R.B. 1076, 1991 WL 197152 (1991), which held that an employer's "obligation to reinstate former economic strikers extends only to vacancies created by the departure of replacements from the strikers' former jobs and to vacancies in substantially equivalent jobs." Id. at 1076. The ALJ also recommended that if the Board should reverse him and find that Diamond did discriminate against the returning strikers within the meaning of the Act, it should conclude that it committed an unfair labor practice, since Diamond "failed to establish legitimate and substantial business justifications for placing the returning strikers in the jobs to which they were assigned."
 
 
 7
 The Board reversed. It thought the ALJ had overlooked the statement in Rose Printing to the effect that returning strikers who had no right to reinstatement (because of the unavailability of their former jobs or substantially equivalent ones) were nevertheless "entitled to nondiscriminatory treatment in their applications for other jobs." Rose Printing, 304 N.L.R.B. at 1078. As the Board put it, "although [Diamond] was under no legal obligation ... to reinstate the strikers ..., once it voluntarily decided to reinstate them, it was required to act in a nondiscriminatory fashion toward the strikers." Diamond had discriminated against Miller, Munoz, and Kussair, in the Board's view, by declining "to place them in the [seasonal] positions of quality control assistant, lift truck operator, and loader, respectively, because of their union status and/or because of certain protected union activity they engaged in while on strike." Employing the burden-shifting framework spelled out by the Supreme Court in NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), and NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Board then examined Diamond's asserted justifications for placing the three returning strikers as it did. The Board rejected the contention that the placements were warranted by the employer's concern that the replacement workers might instigate violence against the three and thus justified placement in well-supervised jobs, since "there [was] no evidence that Miller, Munoz, or Kussair were involved" in the strike-related violence allegedly causing Diamond's concern. The Board also dismissed the notion that the placements of Miller and Munoz were justified by their participation in the boycott and the circulation of disparaging leaflets: "[T]he strikers' conduct constituted protected ... activity and there is no evidence indicating that such protection was lost because of threats made by Miller and Munoz to damage or sabotage [Diamond's] equipment or products." Since Diamond had failed to justify its discrimination, the Board found unfair labor practices, the severity of which, "in light of ... their timing," warranted setting aside the rerun election.
 
 
 8
 A divided panel of this court granted Diamond's petition for review and denied the Board's cross-application for enforcement. Diamond Walnut Growers, Inc. v. NLRB, 80 F.3d 485 (D.C.Cir.1996). The full court then vacated the panel's judgment and ordered that the case be reheard en banc.
 
 II.
 
 9
 Diamond Walnut challenges the Board's determination that it lacked substantial business justification for refusing to place the three employees in the specific jobs they sought--quality control assistant, lift truck operator, and loader. It is undisputed that the Fleetwood framework governs this case. The General Counsel under Fleetwood must make out a prima facie case that the employer discriminated within the meaning of the Act, which means the employer's decision as to how to treat the three returning strikers was attributable to their protected activity. Rose Printing establishes that a struck employer faced with an unconditional offer to return to work is obliged to treat the returning employee like any other applicant for work (unless the employee's former job or its substantial equivalent is available, in which case the employee is preferred to any other applicant). See 304 N.L.R.B. at 1078. But Miller and Munoz were not treated like any other applicant for work.[2] Miller was qualified for a seasonal position in quality control that paid 32 cents per hour more than the packing job to which she was assigned. And Munoz was qualified to fill a forklift operating job, a position that paid between $2.75 and $5.00 per hour more than the walnut cracking and inspecting job she received. Diamond admits that it took into account Miller's and Munoz's protected activity in choosing to place them in jobs that were objectively less desirable than those for which they were qualified. Petitioner, although it contended that the discrimination was comparatively slight, does not dispute that its action discriminated against Munoz and Miller within the meaning of the Act. See Great Dane, 388 U.S. at 32, 87 S.Ct. at 1796-97; Laidlaw Waste Systems, 313 N.L.R.B. 680, 1994 WL 57456 (1994).
 
 
 10
 Judge Henderson, nevertheless, devotes much of her opinion, Op. at 337-41, to a proposition not argued by petitioner before the Board or this court: that even if Diamond Walnut's placement of Miller and Munoz was discrimination, it was not a violation of § 8(a)(3) because it was not discrimination that "discourag[ed] membership in any labor organization."[3] It was just too insignificant to influence other employees, therefore the General Counsel never even made out a prima facie case. As we discuss infra, however, it is well-established that a party may not raise before us an argument not presented to the Board, see Sheet Metal Workers, Local Union No. 91 v. NLRB, 905 F.2d 417, 422 n. 10 (D.C.Cir.1990), and equally well-established that we do not consider arguments not presented to us. See Corson & Gruman Co. v. NLRB, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990). Judge Henderson explains her diversion from petitioner's case by relying on petitioner's broad statement of the issue presented (before the panel): "whether the NLRB properly found that Diamond ... violated § 8(a)(3) and § 8(a)(1) of the Act." Judge Henderson's Op. at 338, n.1 (emphasis added). Under that reasoning--which we do not accept--we would be equally free to consider any legal issue implicit in that finding, such as whether the statute of limitations on the General Counsel's complaint had expired or, for that matter, whether the General Counsel was an imposter.
 
 
 11
 Under Fleetwood, after discrimination is shown, the burden shifts to the employer to establish that its treatment of the employees has a legitimate and substantial business justification. See 389 U.S. at 378, 88 S.Ct. at 545-46. Petitioner declined to give Munoz the forklift driver job because of its concern that driving that piece of equipment throughout the plant would be unduly risky in two respects. First, because of the bad feeling between strikers and replacements, Munoz would be endangered if confronted by hostile replacement workers in an isolated area. Second, since Munoz had participated in the bus tour during which the union had accused the company of producing tainted walnuts, Munoz would be tempted to engage in sabotage by using the 11,000 pound vehicle to cause unspecified damage. As for Miller, who was also on the bus tour, the company declined to put her in the "sensitive position of quality control assistant" where "the final visual inspection of walnuts is made prior to leaving the plant." In that position, she would have "an easy opportunity to let defective nuts go by undetected ... or to place a foreign object into the final product, thereby legitimizing the Union's claim of tainted walnuts."[4]
 
 
 12
 The Board rejected as insubstantial the employer's reasons for assigning both employees. We discuss the two situations separately below, but before doing so we deal with a generic argument petitioner raises. It is claimed that the Board's entire approach in this case is inconsistent with its recent opinion in Sunland Construction Co., Inc., 309 N.L.R.B. 1224, 1992 WL 390105 (1992). In Sunland, the Board considered the claim to reinstatement of a striking employee who was a paid union organizer. The Board concluded that the employer had a legitimate and substantial justification to deny reinstatement because of concerns over the union "agent's" possible conflict of interest. See id. at 1231. Here, the ALJ assumed, and the Board accepted, that the three returning strikers were "agents" (though not paid) of the union. Diamond argues that the Sunland right to deny reinstatement to paid union agents necessarily includes the lesser right to place restrictions on the jobs for which such agents will be considered, and it further contends that the fact that the employees in this case were not paid should make no difference. Insofar as Diamond argues that Sunland is inconsistent with the order under review, or at least should have been reconciled, it is an argument that should have been made to the Board. The ALJ determined that Diamond had not shown legitimate and substantial justifications for its treatment of the returning strikers, and, although he cited Sunland, he did so for the proposition that "the Board has continued to adhere to its view that there is no conflict of interest if an employee of the union seeks employment with a company to organize employees." (Emphasis added.) Although Diamond prevailed on an alternate theory before the ALJ, it naturally filed exceptions to this determination (called a finding). The posture of the case was such that if Diamond thought that under Sunland the existence of an agency relationship, whether paid or not, justified its treatment of the returning strikers, it should have argued as much in its appeal from the ALJ's decision. It did not. Our review of Diamond's brief in support of its exceptions to the ALJ's decision, as well as its opposition to the General Counsel's and union's exceptions, reveals that the company never cited Sunland to the Board, nor did it claim that the principles of Sunland should govern the case. We cannot fault the Board for failing to distinguish arguably applicable precedent when the petitioner never raised it or the proposition it stands for. See 29 U.S.C. § 160(e); Sheet Metal Workers, 905 F.2d at 422 n. 10.
 
 A. Munoz
 
 13
 The Board rejected petitioner's proffered justifications for its placement of Munoz on the same grounds as did the ALJ. As to Diamond's purported fear for her safety, no evidence had been produced that Munoz was thought to be responsible for any violence, so there was no reason to believe she would have been a special target. The Board said, "[T]here is no specific evidence that any replacements harbored hostility toward these three strikers, and, if such evidence did exist as [Diamond] claims, we fail to see how placing them in the positions to which they were assigned would lessen the perceived danger of retaliatory acts being committed against them." The Board discounted Diamond Walnut's contention that Munoz would be under greater protection if closely supervised, noting that petitioner had admitted that "Munoz freely roamed the plant unsupervised during her breaks." The Board did not dismiss out of hand, however, the proposition that concern for a returning striker's safety could ever amount to a substantial business justification for a "discriminating" placement; it was careful to state "we find that [Diamond] was not justified in restricting the strikers' job placements out of fear that the replacement employees would retaliate against these three strikers." By so reasoning, the Board implicitly rejected the view urged by Judge Wald[5]--which is inconsistent with Fleetwood--that an employer is never (or at least "hardly ever," see Op. at 329, n.2) entitled to treat returning strikers "discriminatorily" (even with a substantial business justification) based on protected activity. See also NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The Board's reasoning also necessarily suggests that it does not consider the substantial justification test as coextensive with the test for employee misconduct because whether the returning strikers were threatened with violence does not turn on their culpability.
 
 
 14
 As for the possibility that Munoz would engage in forklift sabotage, the Board was more terse, stating only that "the strikers' conduct [referring to the bus tour] constituted protected ... activity," and there was no evidence indicating that such protection was lost because of threats made by Miller and Munoz. If Munoz had uttered specific threats of sabotage, however, she would have lost her protected status and we would not be dealing with a Fleetwood situation at all; the General Counsel would not even have established a prima facie case. See, e.g., NLRB v. W.C. McQuaide, Inc., 552 F.2d 519, 528 (3d Cir.1977). It is true, as Judge Wald emphasizes, Op. at 329-330, that the Board has always insisted on specific evidence of striker misconduct before concluding that a striker has lost the protection of the Act. See, e.g., Medite of New Mexico, Inc. v. NLRB, 72 F.3d 780, 790 (10th Cir.1995). But that doctrine is not relevant to this case; petitioner, as we have noted, is not claiming that Munoz and Miller were guilty of misconduct. And the Board has not overlapped these two distinct concepts in the manner in which Judge Wald advocates--her newly designated specific evidence "rule." Compare, e.g., Medite of New Mexico, 314 N.L.R.B. 1145, 1994 WL 508144 (1994) (examining whether an employee lost protection of the Act due to specific evidence of strike misconduct), enf'd, 72 F.3d 780 (10th Cir.1995); Calliope Designs, Inc., 297 N.L.R.B. 510, 1989 WL 224492 (1989) (same), with, e.g., Sunland, supra.[6] After all, the Fleetwood substantial justification test assumes that the employees in question have engaged in protected activity. See also General Electric Co. v. NLRB, 400 F.2d 713 (5th Cir.1968), cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969). So we take the Board necessarily to have concluded that the possibility of Munoz engaging in future sabotage by misuse of her forklift was simply not a sufficient risk to constitute a substantial business justification for her treatment.
 
 
 15
 Petitioner claims that the Board's conclusion lacks "substantial evidence," implicitly assuming that that conclusion is a finding of fact. But it is apparent that the Board, in determining whether Diamond Walnut had a substantial business justification, was not really finding a fact; its determination was certainly not an appraisal of an historical happening. Instead, the Board made a normative judgment, a mixed policy/legal determination, which would typically be reviewed according to the arbitrary and capricious standard of the Administrative Procedure Act (reasonableness). The NLRA's judicial review provision, 29 U.S.C. §§ 160(e), (f), does not explicitly include the APA's arbitrary and capricious standard, but the Supreme Court has always assumed that Congress intended the judicial review provisions of both acts to be equivalent, see Universal Camera v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 463-64, 95 L.Ed. 456 (1951), and has read the NLRA as if it included an arbitrary and capricious test, see, e.g., Linden Lumber Division, Summer & Co. v. NLRB, 419 U.S. 301, 309-10, 95 S.Ct. 429, 434-35, 42 L.Ed.2d 465 (1974), as have we, see, e.g., Gilbert v. NLRB, 56 F.3d 1438, 1445 (D.C.Cir.1995); Cleveland Constr., Inc. v. NLRB, 44 F.3d 1010 (D.C.Cir.1995); cf. Bangor Hydro-Electric Co. v. FERC, 78 F.3d 659, 663 (D.C.Cir.1996).[7]
 
 
 16
 An employer's concern for the safety of a few returning strikers, put in the midst of a majority of replacements in a strike marked by violence, may be genuine, but it is hardly unreasonable for the Board to insist, at minimum, on evidence of a concrete threat to those strikers. Otherwise, such a generalized concern could all too easily serve as a handy pretext for disfavoring returning strikers. Moreover, if there were such a threat, the employer might well be obliged to take adequate prophylactic measures that bear upon those who threatened the violence rather than those who were threatened. Cf. Brown v. Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 719 n. 1, 15 L.Ed.2d 637 (1966) (rejecting the notion of a "heckler's veto" in the First Amendment context). In sum, we think the Board's conclusion on this point easily passes the reasonableness test.
 
 
 17
 Similarly, the Board was reasonable in its determination that the risk of Munoz engaging in sabotage while riding around on her 11,000 pound forklift--the petitioner seems to most fear her crashing the forklift into machinery--is not a substantial business justification for her disadvantageous placement in another job. Strikes tend to be hard struggles, and although this one may have been more bitter than most, there is always a potential danger of returning strikers, particularly while the strike is still ongoing, engaging in some form of sabotage. There is therefore undeniably some risk in employing returning strikers during a strike. But it could not be seriously argued that an employer cannot be forced to assume any risk of sabotage, because that would be equivalent to holding that an employer need not take back strikers during an ongoing strike at all--at least unless they manifested a break with the union. See Fleetwood, 389 U.S. at 380, 88 S.Ct. at 546-47. As the Supreme Court noted in NLRB v. Town & Country Electric, Inc., 516 U.S. 85, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), the Board must consider "alternative remedies" available to a company that contends that rehiring union organizers would pose a risk of "unlawful (or possibly unlawful) activity." Id. at ----, 116 S.Ct. at 457. One factor to consider in evaluating the risk posed by a returning striker is the company's ability to detect his or her unlawful activity. In this regard, if Munoz engaged in forklift sabotage, it would presumably be readily detectable.
 
 
 18
 Nevertheless, different Boards at different times might reach different appraisals as to how much of a risk of sabotage constitutes a substantial business justification. Compare Sunland, supra. It is important to recognize that where the Board draws the line has significant policy implications and the Board, as the Supreme Court has observed, is the agency Congress entrusted to formulate national labor policy. See, e.g., Curtin Matheson,, , 494 U.S. at 786, 110 S.Ct. at 1549. We therefore cannot quarrel with the Board's decision that the potential sabotage risk of giving Munoz the forklift driver job was not a substantial business justification. Petitioner has shown no particularized evidence to buttress its primary concern--that there is a risk that she would misuse the forklift--and therefore the Board's appraisal of the employer's justification as inadequate, keeping in mind the labor policy implications, is not unreasonable.
 
 B. Miller
 
 19
 The Miller case is another matter. It will be recalled that petitioner declined to assign her to the post of quality control assistant, the job responsible for the final inspection of walnuts leaving the plant (she received a job paying 32 cents an hour less). The Board rejected the employer's justification, which was based on Miller's participation in the product boycott and bus tour leafleting, saying only--as we have noted with regard to Munoz--"the strikers' conduct constituted protected ... activity and there is no evidence indicating that such protection was lost because of threats made by Miller and Munoz to damage or sabotage ... equipment or products." With respect to Miller, we think the Board's determination that petitioner's business justification is insubstantial is flatly unreasonable.
 
 
 20
 All strikes, as we have recognized, are a form of economic warfare, but when a union claims that a food product produced by a struck company is actually tainted it can be thought to be using the strike equivalent of a nuclear bomb; the unpleasant effects will long survive the battle. See Craig Becker, "Better Than a Strike": Protecting New Forms of Collective Work Stoppages under the National Labor Relations Act, 61 U. CHI. L. REV . 351, 375 & n.113 (1994). The company's ability to sell the product, even if the strike is subsequently settled, could well be destroyed. If a customer becomes apprehensive to bite into Diamond's walnuts because of a concern at finding an impurity (even part of a worm), it is unlikely that a strike settlement will eliminate that visceral fear. Petitioner does not challenge the Board's conclusion that the "tainted walnuts" campaign was protected,[8] and it is not up to us, sua sponte, to decide that issue. Compare Judge Wald's Op. at 336-337;; Judge Henderson's Op. at 342.[9] But to conclude the campaign was protected obviously does not determine whether the company's justification was substantial. The Fleetwood paradigm, we repeat, assumes protected conduct, as well as discrimination because of the protected conduct, before the burden shifts to the employer to produce a legitimate and substantial business justification. In that respect, not all protected conduct can possibly be thought equal; different protected conduct may well give rise to different justifications.
 
 
 21
 We therefore take the Board to mean, as we did regarding Munoz, that petitioner was obliged to show something more than it presented to support its concern that putting Miller in the quality control position would provide her "with an easy opportunity to let defective nuts go by undetected or to place a foreign object into the final product thereby legitimizing the Union's claim of tainted walnuts." (Emphasis added.) Again, we emphasize that if petitioner had actual evidence that Miller had sabotaged the walnuts, which Judge Wald insists be produced, Op. at 329-330,, Miller would be unprotected by the Act, and petitioner need not offer any justification for discriminating against her. The issue, then, is not whether there is sufficient evidence for the Board to have determined that Miller did not engage in past misconduct, but rather whether the employer had a legitimate concern, based on the undisputed evidence and the employer's claimed factual inferences--presented to and unchallenged by the Board--that her employment as a quality control assistant would have posed an unusual and serious risk that she would engage in future misconduct of a particular kind, at great cost to petitioner. Cf. Steffan v. Perry, 41 F.3d 677, 690 (D.C.Cir.1994) (en banc) (explaining circumstances in which the Defense Department can avoid the risk of future misconduct without a showing of past misconduct). The Board seems to have ignored those concerns without discussion, holding in effect (but not explicitly) that no matter what the objective risk to the employer of a returning striker's possible mischief the employer can never meet the substantial justification test.
 
 
 22
 The Board does not quarrel with petitioner's contention that the potential damage if the public learned of impurities in Diamond's walnuts would be extraordinary. One wellpublicized worm might eviscerate the company's market share, especially in light of the public's "awareness" (due to the union's campaign) that Diamond's product might be tainted. Nor does the Board dispute that Miller in the quality control position would have had the capacity to cause such damage to the company. Judge Wald offers an explanation for rejecting Diamond Walnut's concerns not adopted by the Board, which relies on disputable interpretations of portions of the transcript (not even designated by the Board's counsel as part of our record[10] presumably because the Board did not base any findings on that testimony), i.e., that the quality control assistant role is really not so important. It is simply not so, as Judge Wald asserts, Op. at 331,, that Diamond Walnut's quality control manager testified that its "final product" "inevitably ha[s] defects such as mold, rancidity, and worms" (emphasis added) (that sounds like the product boycott propaganda). In fact, he testified that the quality control assistant's job is to alert the production people concerning defects in the production line and then it is up to the production people to "eliminate[ ] those defects from the product."[11]
 
 
 23
 The Board's counsel argues, as the Board implicitly concluded, that it is unfair to assume that an employee would behave in a disloyal and improper fashion. It is unnecessary, however, for us to make that assumption to decide the Board was unreasonable. The Board accepted petitioner's contention that Miller would have been placed "in the sensitive position ... where final visual inspection of walnuts is made prior to leaving the plant," which for purposes of judicial review is equivalent to the Board making a finding to that effect.[12] Miller would therefore have been put in a rather acute and unusual conflict of interest in which her job for her employer could be thought to have as a function the rebutting of her union's claim. A similar conflict would be raised if she wished a bargaining unit job in the company's public relations department. This conflict makes all too likely the possibility that Miller would be at least inattentive to her product quality duties, and inattention is all it would take for Diamond to suffer a potentially crippling blow. To make matters worse, any "mistake" by Miller on the product quality control line would not be easily attributable to her unless petitioner paid someone to stand all day looking over Miller's shoulder--which obviously exceeds any reasonable requirement. If Munoz ran her forklift into valuable machinery, she would run a risk of being discovered and would therefore be deterred. But Miller, as a quality control assistant, could simply avert her eye and cause the damage with apparently little risk of discovery. Unlike the typical situation in which, as Town & Country recognized, see 516 U.S. at ----, 116 S.Ct. at 457, an employer has other remedies to deal with sabotage, those remedies are clearly not adequate here. There is no remedy that might lie against Miller that could compensate Diamond for the type of damage even a moment's lapse on her part could cause. In short, she would have had a special motive, a unique opportunity and little risk of detection to cause severe harm. Both the risk Diamond faced in its placement of Miller was qualitatively different than a normal risk of sabotage, and the deterrence to Miller's possible misbehavior was peculiarly inadequate.
 
 
 24
 * * * * * *
 
 
 25
 Our two groups of concurring and dissenting colleagues--from opposite vantage points--object to the distinction we draw between the Board's view of the employer's justification for its treatment of Munoz on the one hand and Miller on the other. To be sure, the Board, as we noted, was rather cryptic and categorical in rejecting petitioner's claim regarding Munoz's potential for sabotage, but we think that is permissible because petitioner did not present the Board with facts that would significantly distinguish the risk of placing Munoz in the forklift job from the risk an employer runs reemploying any returning striker. An agency cannot be expected to respond in a nuanced manner to a simplistic argument. See City of Vernon v. FERC, 845 F.2d 1042, 1047 (D.C.Cir.1988) ("[T]he Commission cannot be asked to make silk purse responses to sow's ear arguments.").
 
 
 26
 Petitioner did, however, present a powerful argument that placing Miller in the position of quality control assistant presented extraordinary risks and here the Board's categorical rejection--in light of petitioner's more focused claim--is unacceptable. Our colleagues accuse us of forcing the Board in the future to "draw fine lines" between those cases in which an employer's discriminatory placement of returning strikers has a substantial justification and those that do not. Exactly so. That is the Board's job; that is what Fleetwood calls for. Essentially the Board has to take into account in a case such as this some consideration of the risk the employer seeks to avoid. Judge Wald challenges us to lay down broader guidelines as to what sorts of jobs, in what sorts of companies, during what sorts of strikes, might be thought equivalent to Miller's placement quality control position. But that is not the test of principled judicial decisionmaking. There may well be other situations in which an employer could produce compelling grounds for a relatively unfavorable assignment of a returning striker. The Board itself implied that a serious threat of violence against the striker might suffice. The legal proposition that governs this case, however, is that the Board must consider whatever special circumstances are presented by an employer asserting the defense of substantial justification, and it may not summarily reject an employer's specific and persuasive explanation.
 
 
 27
 Our disagreement with our colleagues turns very much on our view of the "proper--and properly limited--role"[13] of a court of appeals reviewing an agency decision. We must take a case respecting the boundaries of the controversy, boundaries set by the agency's actual decision and petitioner's particular challenges to that decision. We simply are not at liberty to reconstruct the transcript before the ALJ to arrive at factual findings that the Board itself did not make. Nor are we free to base our decision on arguments that could have been presented to the Board--but were not; nor on legal reasoning the Board might have adopted--but did not.
 
 
 28
 We must, of course, give genuine deference to the Board's interpretation and application of the Act, as glossed by governing Supreme Court decisions, as well as the Board's factual findings and those legal/policy decisions implicit in the inferences drawn from those findings. But we are still obliged to ask in the last analysis whether the Board's decision, as to whether the employer's action was substantially justified by business reasons, falls within the broad stretch of reasonableness.[14] In this case, at least with respect to one part of the Board's decision, we conclude the Board exceeded the reasonableness limits.
 
 
 29
 So ordered.
 
 
 30
 WALD, Circuit Judge, with whom Chief Judge HARRY T. EDWARDS and Circuit Judge ROGERS and Circuit Judge TATEL join, concurring in part and dissenting in part:
 
 
 31
 In line with my dissent in the earlier panel opinion, I agree with the en banc majority that the Board reasonably determined that Diamond Walnut failed to provide a legitimate and substantial justification, as required under the Fleetwood analysis, for assigning Alfonsina Munoz to a seasonal cracking and inspecting position in the grower's inspection department rather than a seasonal forklift operator position. See NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-80, 88 S.Ct. 543, 545-47, 19 L.Ed.2d 614 (1967). I continue to agree as well that the General Counsel failed to establish a prima facie case of discrimination by Diamond against Mohammed Kussair.[1] But I also believe, as I did with respect to the panel's similar decision, that the majority is fundamentally wrong in concluding that Diamond was justified in assigning Willa Miller to a seasonal case packer position instead of a seasonal quality control assistant position. This latter conclusion contradicts both the majority's own recognition that Board determinations of labor policy must be upheld if reasonable and the majority's discussion of the reason why Munoz's assignment violated the anti-discrimination provisions of the Act. Even more disturbing is the majority's toleration of employer discrimination based solely on an employee's participation in protected product disparagement during and as a strategic part of a labor dispute. This remarkable innovation in labor-management law establishes a dangerous precedent that will be readily embraced by employers and will critically erode employees' statutory rights under the NLRA.
 
 I. PROPER DEFERENCE TO THE NLRB
 
 32
 I begin with a restatement of a fundamental principle of labor law, a principle that should have made an affirmance of the NLRB's decision here without doubt. The Supreme Court has repeatedly instructed lower courts that "the NLRB has the primary responsibility for developing and applying national labor policy." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990). Congress has assigned the Board, not the courts, the task of "applying the general provisions of the Act to the complexities of industrial life ... and of appraising carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases from its special understanding of the actualities of industrial relations." NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963) (internal citations, quotations, and additions omitted). Courts are supposed to accord "considerable deference," Curtin Matheson, 494 U.S. at 786-87, 110 S.Ct. at 1549, to Board policy determinations and rules interpreting the NLRA; they are to be upheld if reasonable, even if the court prefers an alternative policy, and the Board's application of the rules in any specific instance is to stand so long as it is supported by substantial evidence. Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987); NLRB v. Transportation Management Corp., 462 U.S. 393, 402-03, 103 S.Ct. 2469, 2474-76, 76 L.Ed.2d 667 (1983); Gilbert v. NLRB, 56 F.3d 1438, 1444 (D.C.Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 210 (1996). The majority itself identifies this basic principle of labor law in its discussion of Munoz, but appears to lose sight of it altogether a few paragraphs later when it turns to Miller.
 
 
 33
 The need to defer to the Board is particularly acute when the question is whether an employer was justified in discriminating against employees on the basis of the employees' protected activities. "[P]rotected activity acquires a precarious status" if an employer can discriminate against employees simply for engaging in it. NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 173, 13 L.Ed.2d 1 (1964). Determining whether an employer's discrimination was justified thus involves weighing employer prerogatives against employee rights, and the Board's expertise is critical to ensuring that " 'the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy' " is achieved. Fleetwood, 389 U.S. at 378, 88 S.Ct. at 546 (quoting NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33-34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967)). Thus, courts have repeatedly underscored that where the Board has "draw[n a] line between the[ ] conflicting rights [of employees and employers,] ... its determination, unless illogical or arbitrary, ought not to be disturbed." Allied Indus. Workers, Local Union No. 289 v. NLRB, 476 F.2d 868, 880 (D.C.Cir.1973) (quoting NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir.1965)); see also Columbia Portland Cement Co. v. NLRB, 915 F.2d 253, 256 (6th Cir.1990); NLRB v. Chelsea Labs., Inc., 825 F.2d 680, 683 (2d Cir.1987).[2]
 
 
 34
 There seems to me no question but that the Board's conclusion that Diamond's discriminatory treatment of Miller was unjustified was neither arbitrary nor illogical. The Board's conclusion rested on a perfectly reasonable determination of labor policy under the Act, namely that an employer must have some credible evidence linking an employee to potential product tampering before the employer can discriminate against her because it fears she will undertake such misconduct. The solitary fact that the employee supports a union that has engaged in protected product disparagement as part of its strike strategy is not enough to justify discriminating against the employee in the terms of her employment. The Board's determination here was based on a long-adhered-to rule, upheld by several courts, requiring an employer to have specific evidence of past or imminent misconduct by a particular employee before it may discriminate against that employee. See, e.g., Medite of New Mexico, Inc. v. NLRB, 72 F.3d 780, 790 (10th Cir.1995) (" 'an employer's determination not to reinstate a striker must be based on evidence that the striker personally engaged in strike misconduct' ") (quoting Midwest Solvents, Inc. v. NLRB, 696 F.2d 763, 765 (10th Cir.1982)); NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1477 (7th Cir.1992) ("To lawfully deny an employee reinstatement at the conclusion of a strike [because of strike misconduct], an employer must produce evidence connecting the discharged employees to specific strike misconduct."); see also General Tel. Co., 251 N.L.R.B. 737, 739, 1980 WL 12269 (1980), enf'd, 672 F.2d 895 (D.C.Cir.1981). Here, the Board's finding that there was no evidence whatsoever to connect Miller to any threat of product tampering was supported by substantial evidence; Dan O'Connell, Diamond's vice-president for operations, testified that Diamond had no reason to believe that Miller or any of the returning strikers had ever threatened to damage Diamond's product, see Tr. at 442, nor was there was evidence specifically connecting Miller to the other forms of misconduct--violence and sabotage--that Diamond identified as being concerns. Joint Appendix ("J.A.") at 17-18.
 
 
 35
 The majority contends that this specific evidence rule is not relevant here, because if there were specific evidence of misconduct on the part of the returning strikers, they would have lost the protections of the NLRA and the Fleetwood analysis would no longer apply. Maj. op. at 3236. With all respect, I think the majority is wrong. The specific evidence rule is in reality an application of the Fleetwood analysis. The rule represents the Board's belief that an employer does not have a "legitimate and substantial business justification" for discriminating against an employee because of employee misconduct when the basis for the employer's belief that the employee engaged in misconduct is not specific acts or threats by the employee but only the fact that she engaged in protected activity. See Midwest Solvents, Inc., 696 F.2d at 765 (noting that "strike misconduct ... may constitute a 'legitimate and substantial business justification' for refusing to reinstate a [striking] employee," but only if the "employer's determination not to reinstate ... [was] based on evidence that the striker personally engaged in strike misconduct"); see also Associated Grocers of New England v. NLRB, 562 F.2d 1333, 1335 (1st Cir.1977) (citing Fleetwood and noting "[i]t is well established that serious misconduct during a strike justifies a refusal to reinstate after the strike is over").[3] Nor should it be determinative that the misconduct at issue is future as opposed to past misconduct. The same basic question, namely are the employer's fears of misconduct justified, arises where an employer discriminates against an employee because it thinks the employee will engage in misconduct in the future as when it discriminates because it thinks the employee has done so in the past. Some specific evidence connecting the employee to the misconduct is needed before this question can be answered in the affirmative in either case. As the Board noted repeatedly in its opinion, here "there [wa]s no evidence" connecting any of the returning strikers to the types of misconduct that Diamond feared. J.A. at 17-18 (emphasis added).
 
 
 36
 Paradoxically, the majority accepts the Board's insistence that Diamond must provide some evidence of threats by the returning strikers or replacement workers in affirming the Board's decision that Diamond's discriminatory treatment of Munoz was not justified. Maj. op. at 324.. But it then fails absolutely to tell us how the Board went so wrong in requiring that Diamond also provide specific evidence of potential misconduct with regard to Miller. According to the majority, the Board's error was its failure to "realize" that not all protected employee activity is created equal, and that product disparagement is so qualitatively different from other protected activity that it justifies a discriminatory response where violence would not. Id. at 325-326. Thus, the majority seems to say, the Board ought to have made an exception to its usual rule requiring specific evidence before an employer is justified in discriminating against an employee out of fear of misconduct because the discrimination against Miller was based on a fear of product tampering. An employer is entitled to discriminate against employees who support a union that has engaged in product disparagement so as to keep them out of positions where they might be able to harm the employer's product.
 
 
 37
 It is obvious, however, that whether or not to carve out such an exception from the specific evidence rule for employer fears of product tampering is quintessentially a question of labor policy and should be resolved by the Board on the basis of its widespread knowledge of industry and its experience with a legion of strike situations, not by this court on the basis of a cold record involving one particular incident. The Board has clearly decided not to make any such exception, and its decision is eminently reasonable. The majority's product tampering exception rests on dubious and undocumented assumptions regarding the dangerousness of product tampering as opposed to other forms of misconduct and on a distortion of the record regarding the opportunities for product tampering that quality control assistants possess. Worse, the exception will force the Board into extraordinarily difficult line-drawing endeavors in future cases and has the potential to significantly undercut the ability of employees to appeal to the public for support during labor disputes.
 
 
 38
 II. DRAWING THE LINE: PRODUCT TAMPERING AND THE EXAGGERATED
 
 DANGERS OF QUALITY CONTROL
 
 39
 The core justification that the majority gives for its new product tampering exception is that the economic risk to the employer posed by product tampering is far greater than the risk associated with other forms of misconduct (presumably even violence inside the plant), and therefore an employer is justified in acting to limit this risk on the basis of less evidence or no evidence that the returning employee may present a risk in this regard. Based on the record here, the majority's assumption regarding the impact of an isolated or even a few random incidents of product tampering is greatly exaggerated. According to the majority, even a "moment's lapse" in Miller's vigilance against damaged walnuts could cause Diamond "severe harm," Maj. op. at 327,, and "[o]ne well-publicized worm might eviscerate the company's market share." Id. at 326. But as David Pedro, Diamond's quality control manager, testified, some walnuts, like any "natural or agricultural commodity," inevitably have "defects" such as mold, rancidity, and worms, and Diamond's final product is no exception from that unfortunate phenomena. Tr. at 499. The goal of the quality control department is not so much to ensure that Diamond's packaged product contains no defective walnuts at all, but rather to keep Diamond's walnuts within the levels for defective walnuts established by the USDA. See Tr. at 499, 516.[4] Thus, the majority's dire predictions about one wormy walnut or even several wormy walnuts bringing down the company's sales are largely unfounded.[5]
 
 
 40
 Nor can the majority dredge up any evidence or theory indicating that product tampering is more harmful per se than other misconduct so as to justify a harsher rule. Diamond officials testified, for example, that sabotage of expensive processing equipment for any significant period of time during the peak season could cost Diamond hundreds of thousands of dollars in repairs and lost product. Tr. at 403-06. In its brief, the Board cites the substantial costs that could result if an employee sabotaged a company's computer system. Yet the majority nowhere explains why employers automatically get more leave to discriminate against workers in the case of product tampering and especially in the case of agricultural or food or drug products designed for human consumption. What about the manufacturers of cars that people ride in or toys that children play with or even employers whose business survival depends on the use of expensive equipment? Why should food product manufacturers be the only ones eligible for heightened protection against tampering?
 
 
 41
 But even were we to accept the majority's ad hoc value judgment that the economic consequences of agricultural product tampering are uniquely severe, it is still not at all clear where to draw the line as to what jobs must be labeled off limits to any employee who has not renounced her allegiance to a union that engaged in protected product disparagement during a labor conflict. Should it be the employer's call, or the Board's, or the courts'? The majority avoids confronting this problem by claiming that as a quality control assistant Miller would be uniquely well positioned to harm Diamond's product, because she had only to turn a blind eye to moldy and wormy walnuts rolling down the line and Diamond's reputation and market share would plummet. Unfortunately for the majority, this claim is based on a highly selective and inaccurate reading of the record.
 
 
 42
 To begin with, the record demonstrates that quality control assistants perform a variety of functions and are not the only employees involved in ensuring that damaged and defective walnuts are caught, suggesting that their opportunities for passively harming the product are far more limited than the majority believes.[6] Some quality control assistants, for example, weigh boxes and bags of nuts and make sure the nuts are appropriately packaged. These functions do not involve, primarily, checking the quality of nuts. See Tr. at 509-10; see also Tr. at 414, 459, 472. And even those quality control assistants who are involved in monitoring product quality do not bear responsibility for actually pulling damaged or defective nuts. Rather, they provide information on the level of damaged and defective nuts in a particular crop to the production employees who look for and pull the defective nuts. See Tr. at 470, 490-92, 499-500. In addition, there are inspectors from the Dried Fruit Association at Diamond's plant who inspect Diamond's product after the quality control assistants to ensure that the nuts conform to USDA quality levels. See Tr. at 492-93, 508.[7]
 
 
 43
 A review of the record also makes clear that Diamond was if anything more concerned that Miller would engage in active product tampering as that she would do so passively, by allowing defective walnuts to roll past, and further that many other employees would have a similar opportunity to affirmatively damage Diamond's finished product. Diamond officials emphasized that as a quality control assistant Miller would work without close supervision and that therefore she would have an opportunity to insert foreign objects into packages of walnuts. For example, Dan O'Connell testified that quality control assistants move around the plant extensively "with virtually no supervision," Tr. at 400, and that the areas where the finished product was stored were often deserted, so that employees in those areas "could do virtually anything they wanted to to the product" without detection. Tr. at 413; see also Tr. at 410. According to O'Connell, Diamond officials "did not feel that it would be prudent to give someone who might have the thought of doing something to the product ... the opportunity to do it by putting them in an unsupervised, unobserved position." Tr. at 412. And Vincent Brown, Diamond's human resources director, provided a graphic description of the type of product tampering Diamond feared the returning strikers would do if they were given quality control positions: "[i]f I'm in charge of testing quality and I take a used condom or a used syringe and I put it in a bag of walnuts and ship it off to the Netherlands, now ... I have an international incident." Tr. at 621; see also Tr. at 471. But the record makes clear that there were other positions, such as that of forklift operator, that were similarly unsupervised. See Tr. at 400, 413. If the risk of product tampering associated with the quality control position stems in part from the fact that the lack of supervision provides greater opportunities to actively damage Diamond's finished product, then there is no basis on which to distinguish between quality control assistants and these other similarly unsupervised employees.[8]
 
 
 44
 An examination of the record outside of the majority's distorting lens thus makes clear that quality control assistants do not have a particularly unique opportunity to tamper with Diamond's walnuts, and recognition of this fact demonstrates the over-expansive scope of the majority's product tampering exception. While some jobs may be better suited for launching product sabotage than others, it will not be uncommon for employees in many different positions in a processing plant to gain opportunities for product tampering. Here, for example, the record suggests that not just the quality control assistants but also any of the far more numerous employees involved in processing the walnuts could let defective and damaged walnuts flow through into the final packaged product, and virtually all employees had an opportunity to tamper with the finished product during breaks or if their jobs involved moving around the facility. As a result, the majority's product tampering exception could potentially cover every employee in a plant.
 
 
 45
 Finally, it also is not apparent why employer discrimination based on unsupported product tampering fears should be justified only where a union has previously engaged in protected product disparagement. The suggestion in the majority opinion is that when the union has already made claims of deteriorating product quality, employees who support the union will be tempted to make the union's claims a reality. But, whether or not a union has engaged in prior disparagement, it would still be able to exploit any product impurities to its advantage. As a result, if discrimination based on generalized fears of product tampering is justified because of the uniquely severe economic impact that product tampering can have, employers can make out a good case for refusing to hire any employees who do not renounce their allegiance to the union whenever a labor conflict is ongoing.
 
 
 46
 The impossibility of cabining the majority's newly-hatched exception to the Board's traditional rule that employers must have specific evidence linking an employee to potential misconduct before discriminating provides a powerful reason why the Board was justified in refusing to adopt it in the first instance. Section 7 of the NLRA provides employees with the right "to self-organize, to form, join, or assist labor organizations, ... and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1994). The majority's exception would go far to erode or even eliminate these important section 7 rights during an ongoing labor dispute, since its logic leads insistently toward allowing employers during a strike to discriminate against employees who continue to support the union based on unproven and generalized fears of employee misconduct that are derived solely from employee participation in supposedly protected union activities. At a minimum, the majority's rule will force the Board to draw difficult fine-line distinctions between risks serious enough to merit employer action based on generalized fears and not so serious risks. The Board can hardly be faulted for seeking to avoid such an unenviable task. Cf. Eastex, Inc. v. NLRB, 437 U.S. 556, 574, 98 S.Ct. 2505, 2516, 57 L.Ed.2d 428 (1978) ("It is apparent that the complexity of the Board's rules and the difficulty of the Board's task might be compounded greatly if it were required to distinguish not only between literature that is within and without the protection of § 7, but also among subcategories of literature within that protection.").
 
 
 47
 The majority insists that it is not overstepping the "proper--and properly limited--role," Maj. op. at 327 (citation omitted), of an appellate court in requiring the Board to allow an employer to discriminate against an employee because of generalized fears of product tampering; instead, according to the majority, it is merely forcing the Board to "take into account ... the risk that the employer seeks to avoid" and making the Board do its "job." Id. at 327. What the majority refuses to acknowledge is that the Board did do its job here. Without question, given the potential for undercutting employees' rights and the difficulties in administration that the majority's product tampering exception represents, the Board's decision not to adopt such an exception was eminently reasonable. Were this court to truly adhere to its limited role in reviewing an agency decision the Board's determination would be affirmed. Unfortunately, however, the majority finds restraint easier to proclaim than to practice.
 
 
 48
 III. PRODUCT DISPARAGEMENT AND APPEALS TO THE PUBLIC
 
 
 49
 The Board's refusal to allow employers to discriminate against employees on the basis of generalized fears of product tampering was also reasonable because it accords with the Board's current approach to product disparagement and with the Board's recognition of the importance of employee appeals for public support during a dispute. Initially, the Board viewed any "[s]tatements made by employees to the public which deliberately cast discredit upon their employer's product or service" as unprotected, regardless of whether the statements were made in connection with a labor dispute and regardless of whether the statements were true. Patterson-Sargent Co., 115 N.L.R.B. 1629-30 (1956); see also Coca-Cola Bottling Works, 186 N.L.R.B. 1050, 1054 (1970), enf'd in part, 466 F.2d 380 (D.C.Cir.1972); Jefferson Standard Broad. Co., 94 N.L.R.B. 1507, 1511-12 (1951), enf'd sub nom. NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (Jefferson Standard). But over the last few decades the Board changed its approach and its current position is that in some circumstances employee criticism of an employer's product or service is protected activity under the NLRA. Specifically, the Board now views protected activity as encompassing criticism that clearly relates to an ongoing labor dispute, is not malicious in tone, and is not deliberately or recklessly untrue. See, e.g., Cincinnati Suburban Press, Inc., 289 N.L.R.B. 966, 967, 1988 WL 214126 (1988); Emarco, Inc., 284 N.L.R.B. 832, 834, 1987 WL 89746 (1987); Cordura Pubs., Inc., 280 N.L.R.B. 230, 231-32, 1986 WL 53893 (1986); Richboro Community Mental Health Council, Inc., 242 N.L.R.B. 1267, 1267-68, 1979 WL 9209 (1979); see also American Arbitration Ass'n, Inc., 233 N.L.R.B. 71, 74-75, 1977 WL 9257 (1977) (ridiculing content and tone of questionnaire distributed by employee rendered it unprotected under the Act); see generally Sierra Publ. Co. v. NLRB, 889 F.2d 210, 216-18 (9th Cir.1989) (detailing the shift in the Board's approach).[9]
 
 
 50
 This change in the Board's approach to product disparagement is not, as the majority suggests, Maj. op. at 325 n.8, suspect in light of the Supreme Court's decision in Jefferson Standard. The Court ruled in Jefferson Standard that a television station did not act unlawfully when it fired nine technicians who had circulated a handbill that was sharply critical of the station's programming. In holding that the NLRA did not require the employer to tolerate such "disloyalty," the Court emphasized that the technicians' criticism of the station's programming "omitted all reference" to the "labor controversy" then existing between the technicians and the station. Jefferson Standard, 346 U.S. at 472, 476, 74 S.Ct. at 176, 178-79. Thus, in treating criticism of an employer's product that is related to an ongoing labor dispute as protected the Board has adhered to the specific holding of the Jefferson Standard opinion, and the Board's approach has been upheld by numerous courts. See, e.g., Sierra Publ. Co., 889 F.2d at 217-19; Misericordia Hosp. Med. Ctr. v. NLRB, 623 F.2d 808, 814-15 (2d Cir.1980); Community Hosp. of Roanoke Valley, Inc. v. NLRB, 538 F.2d 607, 610 (4th Cir.1976); see also Cynthia L. Estlund, What Do Workers Want? Employee Interests, Public Interests, and Freedom of Expression Under the National Labor Relations Act, 140 U. PA. L.REV. 921, 935 (1992).
 
 
 51
 More to the point, the Board's current approach is based on its awareness of the vital role of public support in winning labor disputes, an awareness shared by the Supreme Court. See Eastex, Inc., 437 U.S. at 565, 98 S.Ct. at 2512 ("We also find no warrant for petitioner's view that employees lose their protection under the 'mutual aid or protection' clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship."). Given capital mobility and the threat of permanent replacements, labor battles are increasingly fought not on the picket line but in the arena of public opinion, through boycotts, corporate campaigns and other appeals. See Melinda J. Branscomb, Labor, Loyalty, and the Corporate Campaign, 73 B.U. L.REV. 291, 293-96 (1993); James G. Pope, Labor-Community Coalitions and Boycotts: The Old Labor Law, the New Unionism, and the Living Constitution, 69 TEX. L.REV. 889, 902-10 (1991). The success of these appeals turns on the ability of employees to ally their cause with the public interest, and in furtherance of that goal employees often seek to demonstrate how their interests and those of the public coincide by arguing that labor disputes or poor working conditions are harming the employer's product. Thus, for example, workers have sought to gain public support by claiming that extended negotiations on a new contract were putting a newspaper's continued survival into jeopardy and sending the paper "speeding downhill," Sierra Publ. Co., 889 F.2d at 214, or that staff shortages and bad facilities were undercutting patient care at a hospital. Misericordia Hosp. Med. Ctr., 623 F.2d at 810-11. And so here, the union circulated leaflets claiming that Diamond's use of replacement workers had resulted in low quality walnuts, not out of a general disloyalty or dislike of Diamond but rather in an attempt to bring consumers onto its side so as to end the strike and return the regular employees to their old jobs.
 
 
 52
 A limited and legitimate use of product disparagement therefore may often be a critical tool in labor's arsenal. The Board has emphasized this point in its decisions holding some forms of product disparagement to be protected, commenting that "were we to hold that employees must limit their requests for third-party assistance to the strict confines of the specific arguments raised with their employer, we would, in many cases, be depriving employees of what may be their most cogent argument for obtaining the third party's aid." Allied Aviation Serv. Co., 248 N.L.R.B. at 231 n. 10; see also Sierra Publ. Co., 889 F.2d at 217 ("[i]f unions are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision."); Emarco, Inc., 284 N.L.R.B. at 834 ("employee speech is often an essential means of achieving group goals and to deny protection to this type of activity would nullify the rights guaranteed by section 7 of the Act"). In addition, product quality may be a central concern of employees, either because they fear that a low quality product will lead their employer to go out of business and cost them their jobs, or because they identify with their work and genuinely care that the product with which they have identified their working lives be a worthy one. See Estlund, supra, at 949-60.
 
 
 53
 The majority's castigation of any kind of product disparagement, true or untrue, strike-related or not, to a second-class status in the scheme of protected activity and to a top rung on the hierarchy of employer justifications for discrimination may significantly restrict the ability of employees to utilize public appeals in contemporary labor struggles or to voice their concerns about product quality. The majority maintains that "it is not up to us, sua sponte, to decide th[e] issue" of whether the union's leaflets attacking the quality of Diamond's walnuts during the strike were protected. Maj. op. at 325-326.8. But the majority's holding is crystal clear: at a bare minimum, it says that an employer can refuse to place returning employees who still support the union in positions where they could affect product quality if the union has engaged in product disparagement during an ongoing labor dispute. Hence, a union is on notice that it exposes supportive employees to potential discrimination if it decides to resort to product disparagement of any kind. Few unions may be willing to take this risk.
 
 
 54
 * * *
 
 
 55
 The majority's decision that Diamond's discrimination against Miller was justified is internally inconsistent, contradicted by the record, and at odds with governing law. Most importantly, it represents a totally unwarranted interference with the Board's ability to establish labor policy. Whether dire predictions regarding its potential impact prove accurate only time will tell. It may be that the holding will be viewed as an anomaly, the D.C. Circuit's inexplicable "wormy walnut rule." I fear, however, that will not be so; employers will readily seize the opportunity to exploit the new hole in the NLRA's protective shield against arbitrary employer discrimination and the Board's efforts to balance employee and employer rights will be impeded by this unfortunate decision, as will employees' attempts to exercise their statutory rights during bitter and lengthy strikes. For all these reasons, I would uphold the Board's determination that Diamond's discriminatory treatment of Miller was not justified by any legitimate or substantial reason and I respectfully dissent from the majority's decision to the contrary.
 
 
 56
 HENDERSON, Circuit Judge, with whom SENTELLE, Circuit Judge, and RANDOLPH, Circuit Judge, join, concurring in part and dissenting in part:
 
 
 57
 No clear winner emerges from the court's decision. Diamond Walnut (Diamond) prevails on its petition for review with respect to two employees, the National Labor Relations Board (Board) prevails on its cross-petition for enforcement with respect to one employee and the intervenor unions, Cannery Workers, Processors, Warehousemen & Helpers Local 601 of the International Brotherhood of Teamsters, AFL-CIO and the International Brotherhood of Teamsters, AFL-CIO (Unions), will probably get a third bite at the representation election apple. The loser, however, is clear--the employer who, in future, must determine where to place returning strikers in order to comply with the National Labor Relations Act (Act). The majority opinion, with its placement of Miller, Munoz and Kussair into three distinct doctrinal boxes,[1] provides lots of words but scant utility.
 
 I.
 
 58
 Too little attention has been paid in this case to the General Counsel's burden in establishing a prima facie case of discrimination.[2] The majority concludes perfunctorily that Diamond's placement of Miller and Munoz constitutes discrimination within the meaning of the Act on the basis of two factors: (1) Miller and Munoz did not receive the highest paying jobs for which they were qualified[3] and (2) Diamond admits that it considered Miller's and Munoz's union activities in placing them. Maj. Op. at 321..
 
 
 59
 The majority's conclusion, however, conflicts with the court's unanimous conclusion that the General Counsel failed to establish a prima facie case of discrimination with respect to Kussair because the two factors the majority uses to establish discrimination apply equally to Kussair.[4] The loader position Kussair claimed he should have been given paid more than the position in which he was placed and, as Diamond concedes, in placing Kussair it considered his union activity. Pet'r Opening Br. at 20. Thus the combination of known (and considered) union activity and a lower paying job cannot be sufficient to establish prima facie discrimination here because, as we all agree, Diamond did not discriminate against Kussair.
 
 
 60
 The inconsistency between the majority's treatment of Kussair on the one hand and Miller and Munoz on the other results from its incomplete statement of the law on what constitutes a prima facie case. The majority opinion states that under Fleetwood the General Counsel could establish a prima facie case here if "the employer's decision as to how to treat the three returning strikers was attributable to their protected activity." Maj. Op. at 1263. That, however, is only part of the story. The Fleetwood framework for evaluating discrimination in the context of striker reinstatement is drawn directly from the Supreme Court's general explication of section 8(a)(3) discrimination in NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). See NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 545-46, 19 L.Ed.2d 614 (1967) (citing Great Dane). Under Great Dane the fact that an employer considers protected activity in its treatment of employees is not sufficient to constitute unlawful discrimination under the Act. Rather, employer conduct constitutes unlawful discrimination under section 8(a)(3) only if there is "discrimination and a resulting discouragement of union membership." Great Dane, 388 U.S. at 32, 87 S.Ct. at 1796 (emphasis added) (citing American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965)).[5] Furthermore, whether an employer's action discourages union membership is a necessary element of the General Counsel's prima facie case. See id. at 34, 87 S.Ct. at 1797-98 (burden shifts to employer "once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent") (emphasis in original).[6]
 
 
 61
 On this record the General Counsel failed to establish that Diamond's placement of Miller and Munoz could have adversely affected employee rights to any extent. The Board failed even to reach the issue and its order should not be enforced on that ground alone. See JA 17 (concluding a prima facie case had been established solely on the basis of the General Counsel's contention that Miller, Munoz and Kussair were placed "because of their union status and/or because of certain protected union activity they engaged in while on strike"). Similarly, the majority never addresses the question whether Diamond's actions could have discouraged union membership or participation in the strike.[7] See NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963) (Discouragement of union membership "includes discouraging participation in concerted activities ... such as a legitimate strike." (citation omitted)). In many cases whether union members have received different treatment and whether there is a resulting discouragement of union membership collapse. In this case the majority relies on the fact that Diamond considered union activity in placing Miller and Munoz in positions that paid less than other positions for which they were qualified. The distance between being paid less because of protected activity and being discouraged from that protected activity may be short. Nonetheless, neither the General Counsel nor the Board nor the majority opinion even tries to make the journey.[8]
 
 
 62
 In determining whether Diamond's placement of the returning strikers could have discouraged protected activity, we must examine more than the differing wages as the majority has done.[9] Comparing the positions offered to Miller and Munoz to the positions they claim they should have been given, I fail to see how it can reasonably be thought that Diamond's placement of them could have discouraged protected activity. Miller and Munoz (and Kussair) crossed the picket line as union agents for the declared purposes of campaigning and monitoring Diamond's pre-election activity. Also, their Union, through William Freitas, the Union official who accompanied the delegation of returning strikers, instructed Diamond that any communications between Diamond and Miller, Munoz and Kussair had to go through the Union rather than directly with the returning strikers. In short, Miller and Munoz returned to campaign--not simply to earn a living. Accordingly, an important, if not the most important, feature of their respective positions was proximity to replacement workers. Diamond contends that "because the striking workers were coming back in part at least to campaign, ... we tried to put them in departments where a lot of people worked and that they had access to being with those people and ... weren't isolated." JA 122 (testimony of Daniel O'Connell, Diamond's vice-president of operations). Accordingly, Diamond placed Miller in the largest department of the plant, containing about 75-80 people, JA 131-32, and Munoz in the second largest department, containing about 50 people, JA 270.
 
 
 63
 By contrast, the jobs that Miller and Munoz claim Diamond should have placed them in provided less contact with replacement workers. The forklift position Munoz claims she should have received would have meant that "in most cases" she would have been "on [her] own." JA 143 (testimony of Daniel O'Connell). Likewise, the quality assurance position that Miller says she should have been placed in required "quite a bit of unsupervised, unobserved freedom." JA 135 (testimony of Daniel O'Connell).[10] In light of both the strikers' dual purposes in returning and their dual capacities as employees and union agents, the General Counsel failed to establish discrimination that could discourage union membership by Diamond's placement of Miller and Munoz in positions that were plainly advantageous to them (and to their union). And to the extent this may be a close call, we do not owe deference to the Board because there is nothing to defer to--the Board failed even to discern the issue of discouragement.
 
 
 64
 But there is little need to speculate about the relative desirability of the positions in which Miller and Munoz were placed and those which they now claim they should have been given. We need only look at Miller's and Munoz's own actions. Miller and Munoz never requested particular jobs nor asked for transfers once Diamond had placed them. While an employee bears no burden to apply for a certain position or to request a transfer (and concedes no rights under the Act by failing to do so), when he fails to do so, his inaction may at least suggest that the position he has been given is not in fact less desirable.
 
 
 65
 More important, the Union never objected to the placement of the workers until after the election. When there is no timely objection to the employer's action, the majority's finding of discrimination solely on the basis of one term of employment--here a small differential in wages--places an intolerable burden on employers. Its approach allows a union that has lost an election (or, as here, two elections) to comb the record after the fact to find an available job with some preferential term that a returning striker was not given--despite the employer's lack of notice of the preference--and then claim discrimination. For example, had Miller and Munoz been placed in the quality assurance and forklift positions, they then most likely would have claimed discrimination from being isolated from the replacement workers. Indeed, the Board has found on several occasions that transferring an employee to an isolated spot constitutes discrimination under the Act. See, e.g., Inductive Components, Inc., 271 N.L.R.B. 1448, 1469, 1984 WL 36761 (1984); Tappan Co., 228 N.L.R.B. 1389, 1390-91, 1397, 1977 WL 8540 (1977), enforced on other issue, NLRB v. Tappan Co., 607 F.2d 764 (6th Cir.1979); Fabric Mart Draperies, Inc., 182 N.L.R.B. 390, 395-96 (1970). In sum, the majority's willingness to find a prima facie case solely on the placement of a returning striker in a position that does not compare favorably in a single aspect with another available position leaves even the best-intentioned employer with little or no guidance on how to assign returning strikers without running afoul of the Act. I conclude that the General Counsel failed to establish a prima facie case with respect to Miller, Munoz and Kussair.
 
 II.
 
 66
 Even if the General Counsel did establish a prima facie case with respect to Miller and Munoz, Diamond had a legitimate and substantial business justification for placing both workers where it did and therefore did not violate the Act under Fleetwood. Diamond feared that the returning strikers could engage in product tampering or sabotage or otherwise disrupt its operation. Miller and Munoz had already participated in a well-publicized cross-country tour urging a national Diamond boycott, a campaign dramatically disparaging Diamond's product. Strikers on the tour distributed leaflets charging that Diamond had hired unqualified replacement workers who allowed contaminated and inedible walnuts--with mold, dirt, oil, worms and debris--to be marketed.[11] Besides its fear that Miller and Munoz might try to make the charges ring true (e.g., by adulterating Diamond's product), Diamond knew Miller's and Munoz's track record of attempting to damage Diamond economically. Consequently Diamond was concerned that once inside the plant the activists could wreak economic havoc by delaying production or otherwise disrupting its operation during peak season.
 
 
 67
 In concluding that Diamond had a legitimate and substantial business justification for putting Miller in the packing position, the majority rejects the assertion that an employer can have a justification based on sabotage only if there have been specific threats from the returning strikers themselves.[12] Rather, the majority accepts that Miller's participation in protected activity that disparaged Diamond's product justified discriminatory placement because "[b]oth the risk Diamond faced in its placement of Miller was qualitatively different than a normal risk of sabotage, and the deterrence to Miller's possible misbehavior was peculiarly inadequate." Maj. Op. at 327.
 
 
 68
 The problem with the majority's handling of Miller is that it is inconsistent with the majority's conclusion that Diamond lacked a legitimate and substantial business justification regarding Munoz. Diamond's concern that Munoz might cause damage while driving the forklift forms only part of Diamond's asserted business justification for placing Munoz where it did. Just as with Miller, Diamond was concerned that Munoz, as a forklift operator, could engage in sabotage by adulterating Diamond's product. Pet'r Opening Br. at 39 (forklift driver "could easily ... mix a harmful substance in with the walnuts").[13] As for the likelihood that Munoz would commit the sabotage, there was no greater disincentive for Munoz than for Miller. As a forklift driver Munoz would have had access to the finished product without any supervisors present. Although the majority opinion concludes that the possibility of Munoz's adulterating the product was an "ancillary concern," Maj. Op. at 322 n.4, the record does not support that characterization. Indeed, when asked whether forklift operators have access to the finished product, Diamond's vice-president of operations responded:
 
 
 69
 In many, many cases they do. Depending upon the area that they work in, much of their access is to the finished product. They're expected to put it away or retrieve it for shipment or move it from one department to another. Finished product can be in a box. It could also be in a metal or wooden bin in which its [sic] finished processing and ready to go into a container. And that's just as even--that's perhaps even more susceptible to any type of contamination or some type of foul play.
 
 
 70
 JA 143-44 (emphasis added).[14] It appears, then, that the only distinction between Miller and Munoz is that Miller could have engaged in sabotage through nonfeasance by allowing an inferior product to pass by her while Munoz would have had to act affirmatively by, for example, placing an impurity in the product. This is too fine a point to put between conduct that violates the Act and conduct that does not.[15] First, what constitutes misfeasance as opposed to nonfeasance is difficult to define. If a quality control worker has a duty to remove impurities and deliberately fails to do so, is the failure nonfeasance or misfeasance? Second, the distinction would require employers, the Board and reviewing courts to assess the relative risks of a returning striker who simply ignores product impurities and one who affirmatively adulterates the product. Such inquiries are likely to send all involved down the road of groundless speculation.
 
 
 71
 * * *
 
 
 72
 The majority opinion draws distinctions among Miller, Munoz and Kussair (resulting in treatment under three different legal rationales) that are not supported by the record. I believe that the General Counsel failed to make a prima facie case of discrimination with respect to any one of the three. In the alternative, I would find that Diamond had a legitimate and substantial business justification for its placement of Miller and Munoz and did not discriminate against Kussair. Accordingly, I concur in the majority's result regarding Miller and Kussair and I dissent from its holding as to Munoz.
 
 
 
 *
 Circuit Judge Garland did not participate in this decision
 
 
 [1]
 Section 8(a)(3) forbids an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section ...." Id. § 158(a)(1). Section 7, in relevant part, guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Id. § 157
 
 
 [2]
 The panel majority concluded that the Board had legitimately determined that petitioner had discriminated against Kussair--by placing him in a lower paying job than a loader--but that this "discrimination" did not discourage union membership (not an argument presented by petitioner). See 80 F.3d at 494. Judge Wald, dissenting in part and concurring in part, concluded that no discrimination was shown because the loader job was generally thought undesirable, and as soon as Kussair complained the company attempted to accommodate him, but he went back out on strike before it could. See id. at 500-01 (Wald, J., concurring in part and dissenting in part). Since the Board did not seek rehearing as to the panel's judgment regarding Kussair, we simply reinstate that judgment
 
 
 [3]
 The Board's decision to overturn the second election was based on its appraisal of the effect of the three unfair labor practices on the bargaining unit. Of course, it will be up to the Board on remand--at least in the first instance--to determine whether the Munoz case alone affected the election, which is a similar question to the one Judge Henderson raises
 
 
 [4]
 Petitioner also suggests that Munoz (like any other employee when unsupervised) could place foreign matter into the finished walnut bags, but this seems only an ancillary concern. The Board does not even mention this specific kind of product tampering regarding Munoz, surely because petitioner did not emphasize this point to the Board any more than it did in its brief and argument before us. Indeed, the Board only stated generally that "there is no evidence ... of threats made by Miller and Munoz to damage or sabotage the Respondent's equipment or products." Our colleagues place a good deal more importance on this risk than does petitioner. See Judge Wald's Op. at 334, n.8; Judge Henderson's Op. at 342 & n.14
 
 
 [5]
 "Even more disturbing is the majority's toleration of employer discrimination based solely on an employee's participation in protected product disparagement during and as a strategic part of a labor dispute." Op. at 328
 
 
 [6]
 Judge Wald relies on general dicta in two circuit court cases mixing up unprotected misconduct with substantial business justification. In neither case was the court reviewing a Board opinion that had done so. See Judge Wald's Op. at 330 (citing Midwest Solvents, Inc. v. NLRB, 696 F.2d 763, 765 (10th Cir.1982); Associated Grocers of New England v. NLRB, 562 F.2d 1333, 1335 (1st Cir.1977))
 
 
 [7]
 In NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 803-04, 110 S.Ct. 1542, 1558-59, 108 L.Ed.2d 801 (1990) (Scalia, J., dissenting), Justice Scalia assumed the APA actually applied directly
 
 
 [8]
 The ALJ's conclusion that the product disparagement was protected appears to be based on cases interpreting the Supreme Court's decision in NLRB v. Local Union No. 1229, Int'l Bhd. of Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) (Jefferson Standard), which held that the dissemination of disparaging information that did not on its face reference the underlying labor dispute was disloyal and cause for termination. The ALJ relied on cases that have read Jefferson Standard to focus principally on the fact that the handbills in that case "omitted all reference" to the labor dispute, 346 U.S. at 476, 74 S.Ct. at 179, and thus to imply that any disparaging information no matter how permanent its potential damage that does refer to the labor dispute is "protected." See, e.g., Sierra Publishing Co. v. NLRB, 889 F.2d 210, 216 (9th Cir.1989); Cincinnati Suburban Press, 289 N.L.R.B. 966, 968, 1988 WL 214126 (1988). But these courts overlooked the Supreme Court's statement in Jefferson Standard that "[e]ven if the attack were to be treated, as the Board has not treated it, as a concerted activity within the scope of those mentioned in § 7, the means used by the [employees] in conducting the attack have deprived the attackers of the protection of that section." 346 U.S. at 477-78, 74 S.Ct. at 179. And the Court apparently saw "concerted activity" to be an appeal for support for the union as opposed to a "separable attack purporting to be made in the interest of the public," id. at 477, 74 S.Ct. at 179, which a product disparagement campaign might be construed as, whether or not it references the labor dispute
 
 
 [9]
 Judge Henderson's observation that "Diamond knew Miller and Munoz's track record of attempting to damage Diamond economically" implies that she concludes that the product boycott was unprotected
 
 
 [10]
 See, e.g., Judge Wald's Op. at 331 (citing Tr. 499); id. (same); id. (citing Tr. 516); id. at 333 (citing Tr. 509-10); id. (citing Tr. 459); id. (citing Tr. 499-500); id. (citing Tr. 508); id. at 333 n. 7 (citing Tr. 512-15)
 
 
 [11]
 He does say on cross examination that walnuts leaving the plant have certain defects (although it is not clear whether he is referring, as he did earlier, to leaving the quality control department), but he certainly does not mention worms
 
 
 [12]
 Judge Wald's review of the transcript, Op. at 332-333 & nn.6-7--again referring to portions not designated as "relevant" by the parties, see D.C. Circuit Handbook of Practice and Internal Procedures, IX.B.1., at 80--leads her to a contrary factual finding, but that is just as impermissible for a reviewing court as it would be if the Board had made the finding rather than accepting the petitioner's factual contention
 
 
 [13]
 Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)
 
 
 [14]
 Judge Wald would shrink our review of the Board's judgment for reasonableness, pointing out that we only review a "cold record." Op. at 331.. But the Board's decision is either reasonable or it is not, and the Board itself reviews a cold record. Cold or hot, it is the only record before us
 
 
 [1]
 Judge Henderson contends that the General Counsel failed to establish a prima facie case of discrimination against any of the returning strikers because the different treatment that they received was not sufficient to "discourage membership in any labor organization." Dissenting opinion ("Dis. op.") at 337-341.. I believe that Judge Henderson's contentions on this score are incorrect and represent an inappropriate refusal to defer to the Board's expertise regarding when employer conduct may discourage union membership. As the Supreme Court has cautioned, identifying discouragement is a "subtle thing[ ] requiring a high degree of introspective perception." Radio Officers Union v. NLRB, 347 U.S. 17, 51, 74 S.Ct. 323, 341, 98 L.Ed. 455 (1954) (internal quotations omitted). I also think that appellate judges should be wary of discounting the importance of what may appear to us to be small wage differentials, see Dis. op. at 340 n.9; the record in this case, for example, establishes that as a case packer Miller earned only $5.50 an hour, and an increase in 32 cents an hour might well have been very significant to her, particularly given that she had been out on strike for two years. Transcript ("Tr.") at 775-76. However, as I agree with Judge Silberman that Diamond waived this argument by failing to raise it before the Board or in its briefs on appeal, I do not discuss this point in further detail
 
 
 [2]
 By some mysterious process of induction, the majority concludes that my position is that "an employer is never (or at least 'hardly ever') entitled to treat returning strikers 'discriminatorily' (even with a substantial business justification) based on protected activity." Majority opinion ("Maj. op.") at 321.. As the preceding passage makes clear, this is not my position; my position is instead that it is especially critical that courts defer to reasonable Board determinations of when discrimination based on protected activity is and is not justified. It is worth noting, however, that the situations in which employer discrimination based on protected activity has been deemed justified are relatively few, the most frequent example being that of an employer who does not reinstate employees to their former positions after an economic strike because the positions have been filled by permanent replacements. See NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938); see generally THE DEVELOPING LABOR LAW 199-249 (Patrick Hardin, et al. eds., 3d ed.1992) (providing an overview of instances when employer discrimination has been held to be justified and when it has not). This suggests to me that the Board and other courts agree that employer claims of justified discrimination against employees solely because of protected activities should be viewed with some caution, given the threat to employee rights that such discrimination represents
 
 
 [3]
 The connection between the Fleetwood analysis and the specific evidence rule is also visible in Board decisions. See, e.g., General Chemical Corp., 290 N.L.R.B. 76, 82, 1988 WL 213875 (1988); Owen Joist Corp., 248 N.L.R.B. 589, 592, 1980 WL 11268 (1980)
 
 
 [4]
 As the majority accuses me of distorting the transcript in my reading of Mr. Pedro's remarks, Maj. op. at 326-327,, I quote them here verbatim. After describing a union flyer that showed pictures of Diamond walnuts with the "statements ... mold, insect damage, dead worm in shell, [and] rancid" directly underneath, the following colloquy took place between Ms. Green, Diamond's counsel, and Mr. Pedro:
 Ms. Green: Do the walnuts that come from Diamond Walnut's production line have those types of defects after they leave the quality assurance assistant's department?
 Mr. Pedro: Okay. There is a tolerance for those defects. And those defects do occur. It's in a natural or agricultural commodity. Any agriculture commodity has specifications or levels for those defects. We do have levels of those types of defects.
 Ms. Green: Okay. So basically, is it the quality assurance assistant's job to make sure that those levels of defects remain low when they come out of the process?
 Mr. Pedro: Their job is to monitor those levels and report those levels and to record the data. The production people are responsible for grading that product and then eliminating those defects from the product.
 Tr. at 499 (emphasis added). Later, on cross-examination Mr. Absalom, the union's counsel, referring to the flyer again, had this exchange with Mr. Pedro:
 Mr. Absalom: I gather from your testimony that it is true that walnuts sometimes leave the plant with some of these defects in them, correct?
 Mr. Pedro: Correct.
 Mr. Absalom: And it's true that walnuts leave the plant with insect damage and rancidity for example?
 Mr. Pedro: Yes, that's correct.
 Mr. Absalom: And what you're principally concerned with in the quality control department is determining whether the level of those defects in the samples that are taken exceed the threshold levels permitted by the USDA, is that correct?
 Mr. Pedro: Yes, that they don't exceed those.
 Tr. at 516 (emphasis added).
 
 
 [5]
 The discovery of some kind of foreign matter in a package of walnuts would be far more dangerous to Diamond's reputation and sales. But, as discussed below, the majority must downplay the risk of this sort of aggressive product tampering in order to conclude that Diamond was justified in discriminating against Miller but not against Munoz
 
 
 [6]
 The majority argues that in emphasizing the varied jobs performed by quality control assistants and the role that other employees and outside inspectors play in ensuring the quality of Diamond's final product, I am improperly making a factual finding that differs from the Board's. Maj. op. at 326 n.12. On the impropriety of appellate factfinding and appellate contortions of the administrative record, the majority and I are in full agreement, but ironically it is the majority who is violating this important principle here. As an initial matter, I disagree that the Board itself made any finding that the quality control assistants are the last to inspect the walnuts; the language quoted by the majority is quite clearly the Board's recapitulation of the argument Diamond made in its defense, not an independent finding of fact. See J.A. at 17 ("Respondent states that when it received the Union's letter [wherein several strikers offered to return to work], it decided against placing Miller in the sensitive position of quality control assistant where the final visual inspection of walnuts is made prior to leaving the plant."). I also fail to see how anyone can read the Board's decision, holding that Diamond's fears of product tampering did not justify its discrimination against the returning strikers, as being anything but a rejection of Diamond's factual inferences. Maj. op. at 325-326.. More to the point, it is the majority, not the Board, that emphasizes the opportunities for product tampering attendant on the quality control assistant position. Indeed, the Board appears to have considered any such opportunities to be either insignificant or irrelevant, since it makes no reference to them at all in rejecting Diamond's defense. See J.A. at 18
 The majority also takes me to task for referring to portions of the transcript of the ALJ hearing that are not contained in the joint appendix. Maj. op. at 326 n.12. But as governing statutes, appellate rules and our local circuit procedures make clear, "[a]ll parts of the record retained by the agency shall be part of the record on review for all purposes." FED. R.APP. P. 17(b); see also 28 U.S.C. § 2112(b) (same); FED. R.APP. P. 16(a) ("order sought to be reviewed or enforced, the findings or report on which it is based, and the pleadings, evidence and proceedings before the agency shall constitute the record on review in proceedings to review or enforce the order of an agency"); D.C. Circuit Handbook of Practice and Internal Procedures, IX.B.1., at 80 ("Failure to include relevant parts of the record in the appendix does not preclude the court from relying on that material."). An examination of the full record would also appear appropriate in light of the Supreme Court's instruction in Universal Camera v. NLRB that courts must uphold the Board's findings if they are supported by substantial evidence on "the record as a whole." 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).
 
 
 [7]
 The record also demonstrates that the majority's assessment of the risk Miller posed is very much one-sided, and ignores the risk of product harm that resulted from Diamond's decision not to put Miller in the quality control assistant position. Miller had served as a quality control supervisor for seven or eight years prior to the strike. Tr. at 139. David Pedro testified not only that Miller was well-qualified to identify damaged or defective walnuts, but also that an experienced quality control worker would be better able to spot such walnuts than a new trainee. Tr. at 512-15. If Diamond gave the open quality control position to a new applicant for employment who did not have Miller's union ties but also did not have Miller's experienced eye, it may have increased the risk that defective nuts would not be spotted during processing. This may well illustrate the wisdom of letting the Board draw the inferences from a site-specific record of the labor situation in a particular plant, not the court
 
 
 [8]
 Indeed, the majority's acceptance of Diamond's discrimination against Miller cannot be reconciled with its rejection of Diamond's discrimination against Munoz. Both Miller and Munoz were strongly supportive of the union during the strike. Tr. at 163, 220-21. Both participated in a cross-country bus tour publicizing the union's boycott of Diamond walnuts, during which the union disseminated leaflets claiming that walnuts packaged by the replacement workers were contaminated. Tr. at 162-63, 220-21. Munoz's ties to the union's product disparagement campaign were, if anything, clearer than Miller's, since Munoz acknowledged passing out the leaflets on occasion and Miller did not. Compare Tr. at 221 with Tr. at 159-61. And, as noted above, Diamond officials testified that forklift operators were not closely supervised and were required to travel to remote areas of the plant. Tr. at 400, 413. Yet the majority maintains that Diamond was justified in refusing to put Miller in a quality control position, but not in refusing to put Munoz in a forklift operator position
 Nor, as the majority implies, is its inconsistent treatment of Munoz and Miller justified by Diamond's failure to adequately identify product tampering as a concern in its treatment of Munoz. It is clear from the testimony of Diamond officials that Diamond was concerned that forklift operators would have opportunity to tamper with the finished product, see Tr. at 400, 413, 420-21, and Diamond claimed that its fears of product tampering justified its refusal to put Munoz in the forklift operator position in its filings with the Board and in both its panel and en banc briefs here. See Employer's Limited Exceptions to the Decision of the Administrative Law Judge at 34 & n.26 (noting that forklift operators, who are not closely supervised had an opportunity to "mix a harmful substance in with the walnuts" and commenting that this concern was "not a farfetched supposition, given the nature of the boycott campaign in which Munoz was actively involved"); Pet. Br. (panel) at 36 (same); Pet. Br. (en banc) at 39 (same). Furthermore, the Board mentioned product tampering as a concern of Diamond's in regard to Munoz. J.A. at 18 ("As the [ALJ] found, the strikers' conduct [in distributing leaflets disparaging Diamond's product] constituted protected Section 7 activity and there is no evidence that such protection was lost because of threats made by Miller and Munoz to damage or sabotage the Respondent's equipment or products.") (emphasis added).
 
 
 [9]
 In some cases, the Board has distinguished between acceptable criticism of an employer's product or service and "product disparagement." See, e.g., Allied Aviation Serv. Co., 248 N.L.R.B. 229, 231, 1980 WL 11228 (1980). But this is a distinction more in nomenclature than in substance, since clearly the critical statements upheld by the Board would be perceived by an ordinary person as "disparaging" the employer's product
 
 
 [1]
 The majority finds a prima facie case of discrimination but a legitimate and substantial business justification as to Miller, a prima facie case but no legitimate and substantial business justification as to Munoz and reinstates the panel judgment as to Kussair
 
 
 [2]
 Notwithstanding the majority's and Judge Wald's protestations, the issue of the General Counsel's prima facie case is properly before the court. First, Diamond argued in its brief to the Board that the General Counsel had not established a prima facie case. See Employer's Opposition to Counsel for the General Counsel and Counsel for the Charging Party's Exceptions to the Decision of the Administrative Law Judge at 6-19 (No. 32-CA-13479) (arguing that Diamond's placement of workers was non-discriminatory because, regardless of union activity, workers were not entitled to have their seniority or qualifications from their previous permanent positions considered in their placement in seasonal jobs). Diamond's initial brief to the panel described the issue presented simply as "whether the NLRB properly found that Diamond ... violated section 8(a)(3) and 8(a)(1) of the Act" and thus encompassed the question whether the General Counsel had established a prima facie case. Moreover, the majority is simply wrong in its statement that Diamond "does not dispute that its action discriminated against Munoz and Miller within the meaning of the Act." Maj. Op. at 321.. What Diamond does not dispute is that it considered Miller's and Munoz's protected activity in placing them. As discussed in more detail infra, that acknowledgment is insufficient to establish a prima facie case unless Diamond's actions also had an adverse effect on protected activity. Whether Diamond's placement of the returning strikers in fact had an adverse effect is vigorously disputed by Diamond. Diamond argues that "the adverse effect of placing the ... strikers in two of the largest departments in the plant, if any, was comparatively slight." Pet'r Opening Br. at 25 (emphasis added). Diamond then detailed why the adverse effect if any of the placement of the returning strikers would be comparatively slight:
 The jobs to which [the returning strikers] were assigned were not inferior or substandard ones. They were right in the mainstream of the plant, in the two biggest departments. More replacement workers held the very same positions given to the strikers than any other positions in the plant. These were not humiliating or difficult jobs in which the strikers were placed; they were the most common and easy jobs in the plant.
 Id.
 
 
 [3]
 The majority characterizes the jobs Miller and Munoz received as "objectively" less desirable than the jobs they claim they should have been given. Maj. Op. at 321.. I take this characterization to be based solely on the wage differential between the respective jobs inasmuch as the majority mentions no other factors supporting its assessment of "objective" desirability
 
 
 [4]
 The majority intimates that it does not conclude anything with respect to Kussair but rather simply reinstates the panel judgment. Maj. Op. at 321 n.2. But the majority's statement that the panel's disposition of Kussair is not before the en banc court--based on the fact that the Board did not seek rehearing on Kussair--is incorrect because the intervenor Unions sought rehearing en banc on the panel's entire decision, including its decision as to Kussair. See Intervenors' Pet. for Reh'g and Suggestion for Reh'g En Banc at 2. We granted the suggestions of both the Board and the Unions, 88 F.3d 1064 (D.C.Cir.1996); accordingly, the panel's disposition of Kussair is before the en banc court
 
 
 [5]
 Similarly, the statute itself forbids only discrimination that "discourage[s] membership in any labor organization." 29 U.S.C. § 158(a)(3) (emphasis added). Although not relevant here, the statute also prohibits discrimination that encourages union activity. Id
 
 
 [6]
 There is also an animus aspect to the discouragement of union membership. Even if employer conduct could discourage union membership, the conduct is not unlawful under the Act unless the employer acted with the purpose of discouraging union membership. Employer animus, however, does not form a part of the General Counsel's prima facie case. See Great Dane, 388 U.S. at 33-34, 87 S.Ct. at 1797-98. Instead, the General Counsel need only produce evidence of animus if the employer's conduct is not "inherently destructive" of employee rights and only after the employer has come forward with evidence of a legitimate and substantial business justification to rebut the General Counsel's prima facie case. Id
 
 
 [7]
 Although unstated, this may be the factor upon which the majority distinguishes Kussair from Miller and Munoz. In other words, because Kussair was given a less onerous job and Diamond agreed to transfer him upon request, it would be difficult to conclude that Diamond's placement of Kussair could have adversely affected employee rights. I think this is precisely the rationale that should be used to explain the lack of a prima facie case with respect to Kussair. As explained infra, the same "missing link" defeats the General Counsel's prima facie case regarding Miller and Munoz
 
 
 [8]
 Fleetwood (a failure to rehire case) is itself a good example of a case where the questions of differential treatment and discouragement of protected activity collapse. Fleetwood declares simply, "If, after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights...." 389 U.S. at 378, 88 S.Ct. at 546. There was, without doubt, discouragement on the Fleetwood facts. This case, however, is not a failure to rehire case and for that reason, among others, the question of discouragement is more difficult
 
 
 [9]
 It would be proper to focus exclusively on wages when, for example, an employer placed returning strikers in positions and paid them less than it was paying replacement workers for the same positions. That would constitute discrimination under the Act and would also result in discouragement of protected activity. The question in this case, however, is different. The alleged discrimination is not only the payment of a lower wage but also the discriminatory placement of a returning striker in one position rather than another. To determine whether that placement is discriminatory it is necessary to compare the position the returning striker received with the position the returning striker claims he should have received. Even when we look at wages in this case, the differentials may not have been enough to discourage protected activity. The record is ambiguous regarding how much Munoz would have earned in the forklift position, stating that it would have been between $2.50 and $5.00 more per hour. As for Miller the job she claims she should have received paid 32 cents more per hour. Assuming a forty hour work week, during the two weeks Miller returned to work she grossed approximately $25 less than she would have in the quality assurance position
 
 
 [10]
 Although O'Connell's testimony that Miller would have been "unobserved" if in the quality assurance position and Munoz would have been "on her own" in the forklift position was given in the context of Diamond's fears of sabotage, the testimony is nonetheless relevant in this context as well. If Miller and Munoz had been unobserved by other workers in the positions they claim they should have been given, they would have been unable to lobby replacement workers and monitor Diamond's actions in the preelection period as well as they could in the two largest departments in the plant where Diamond placed them
 
 
 [11]
 In addition, Diamond's customers and, it appears, the United States Department of Health and Human Services received a letter including the following (false) message:
 Many of the workers that have actually replaced us, the striker's [sic] of Diamond Walnut, are people whom [sic] have police records as being drug addicts, drug dealers, alcoholics and even prostitutes. Through blood testing of workers who have broken the picket line, many of them having bad records, it would be found that there is a significant amount of positive results like the detection of the AIDS virus, Sifillis [sic], Gonorrea [sic], Hepatitis and other contagious diseases with high risk of contamination to the public.
 JA 401-02 (emphasis added). Notwithstanding the highlighted language as well as the signature line which read "The Original and United Workers of Diamond Walnut," the Union disavowed responsibility for the letter and the ALJ gave it no weight.
 
 
 [12]
 Judge Wald characterizes this result as a "remarkable innovation in labor management law" that "establishes a dangerous precedent that will be readily embraced by employers and will critically erode employees' statutory rights under the NLRA," Wald Op. at 328.. Judge Wald's prediction, and her suggestion that employers henceforth may be able to avoid rehiring all returning strikers in every labor dispute, id. at 334, plainly exaggerates the potential effect on employee rights because it fails to fit the employer's business justification into the Fleetwood framework. A finding that an employer has a legitimate and substantial business justification does not end the inquiry under Fleetwood. Even if an employer has such a justification, a violation of the Act can still be established through "specific evidence of a subjective intent to discriminate or to encourage or discourage union membership." NLRB v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963). Moreover, proof of antiunion motivation may be made by way of circumstantial evidence. See Avecor, Inc. v. NLRB, 931 F.2d 924 (D.C.Cir.1991). Although neither the General Counsel nor the Unions were able point to a shred of evidence (direct or circumstantial) of animus here, not every strike case will be so barren. Finally, for employer conduct that is "inherently destructive" of employee rights, the majority's holding is of little import. For that class of cases, the Board can infer antiunion motivation irrespective of a legitimate and substantial business justification. See Great Dane, 388 U.S. at 34, 87 S.Ct. at 1797-98
 
 
 [13]
 Diamond raised the identical concern before the Board, see Employer's Br. in Support of Limited Exceptions to the Decision of the Administrative Law Judge at 34 (No. 32-CA-13467), and before the panel. See Pet'r Opening Br. to the Panel at 36
 
 
 [14]
 The majority's suggestion that I have attached more importance to this matter than is warranted in light of Diamond's failure to "emphasize" this point, Maj. Op. at 323 n.5, is troubling. Apparently, it is not enough to unequivocally make an argument, as Diamond has done here, see Pet'r Opening Br. at 39, but now the party must also "emphasize" each argument. The likely effect of the majority's standard on the verbosity of future briefs to this court is not difficult to discern
 
 
 [15]
 Munoz's "nonfeasance" could also have caused different, but substantial, economic damage to Diamond. The strikers returned during Diamond's peak season and a lackadaisical forklift driver could have prevented Diamond from meeting tight shipping deadlines. JA 245-46